**UNITED STATES of America, Appellee,**

v.

**Gerald R. CARON, Defendant, Appellant.**

No. 94–2026.

United States Court of Appeals,
First Circuit.

Heard May 1, 1995.

Decided Feb. 26, 1996.

Owen S. Walker, Federal Public Defender, for appellant.

Timothy Q. Feeley, Assistant U.S. Attorney, Brian T. Kelly, Assistant U.S. Attorney, Donald K. Stern, United States Attorney, for appellee.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, SELYA, CYR, BOUDIN, STAHL, and LYNCH, Circuit Judges, En Banc.

COFFIN, Senior Circuit Judge.

Appellant Gerald R. Caron was convicted of possessing rifles, shotguns and ammunition in violation of 18 U.S.C. § 922(g)(1), the "felon-in-possession" law. Because at least three of Caron's five predicate felony convictions were for crimes of violence, he was subject to sentence enhancement under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1). Caron received a prison term of 21 years, 10 months, plus a five year term of supervised release. *See* U.S.S.G. § 4B1.4.

The issue in this case is whether three prior Massachusetts convictions should not be counted as predicate crimes under 18 U.S.C. § 921(a)(20), which excludes as predicates

> [a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored ... unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

The questions we must address relate to the words preceding "unless," and, in particular, the procedure by which one "has had civil rights restored." Under Massachusetts laws of general application, two of Caron's basic civil rights were restored automatically after a lapse of time or at the expiration of his sentence; the remaining one was never taken away from him.

In an earlier stage of this case, *United States v. Caron,* 64 F.3d 713, 718 (1st Cir. 1995), a panel of this court, deeming itself

bound to follow *United States v. Ramos*, 961 F.2d 1003 (1st Cir.1992), held that the requirements of § 921(a)(20) can be met only by "focused, individualized, affirmative action," not by laws of general or automatic application. We subsequently decided to reconsider this holding *en banc*, allowed the panel opinion to remain in effect as to the other issues decided, and asked for briefing on one additional issue: whether, as the *Ramos* panel reasoned (regarding misdemeanors), § 921(a)(20) cannot be satisfied where civil rights are not lost as a collateral consequence of conviction, since there is "no individualized official judgment" evidencing the state's "renewed trust" in the individual. *Ramos*, 961 F.2d at 1009.

The government, after having filed a brief urging adoption of the panel's position, notified us that it was no longer defining the restoration of civil rights to exclude automatic affirmative actions based on generic statutes. It nevertheless did not retreat from its insistence that some affirmative action was required to "restore" such rights. And it did not withdraw its fallback contentions that Massachusetts statutes do not fully restore the civil rights of convicted felons and, in any event, expressly restrict their rights to possess firearms. Notwithstanding the government's change of position, which was unexplained, we must arrive at our own independent judgment.

After due deliberation, we now hold, in accordance with our seven sister circuits,[1] that civil rights may be restored within the meaning of § 921(a)(20) by laws of general application. We also hold that, at least where some civil rights are restored by the operation of such laws, the fact that one civil right was never lost does not prevent an individual from having "had civil rights restored" within the meaning of the provision.

## BACKGROUND

### A. *Facts*

We briefly set forth the relevant facts. On two occasions in 1993, rifles, shotguns and

---

1. *McGrath v. United States*, 60 F.3d 1005 (2d Cir.1995); *United States v. Hall*, 20 F.3d 1066 (10th Cir.1994); *United States v. Glaser*, 14 F.3d 1213 (7th Cir.1994); *United States v. Thomas*, 991 F.2d 206 (5th Cir.1993); *United States v.*

ammunition were seized from Caron. At the time of his arrest, his criminal record included three Massachusetts felony convictions (1958, 1959, and 1963), a California felony conviction (1970), and a federal firearms felony conviction (1977). All four state convictions constituted violent crimes which could serve as predicates under the ACCA. *See* 18 U.S.C. § 924(e)(2)(B).

### B. *Massachusetts Statutory Scheme*

■ "Civil rights," within the meaning of § 921(a)(20), have been generally agreed to comprise the right to vote, the right to seek and hold public office, and the right to serve on a jury. *United States v. Cassidy*, 899 F.2d 543, 549 (6th Cir.1990). As an initial matter, therefore, we recount the relevant Massachusetts laws corresponding to these rights.

A convicted felon in Massachusetts does not lose the right to vote. *See* Mass.Gen.L. ch. 54, §§ 86, 103B. He does, however, lose the right to hold public office while serving his sentence. Mass.Gen.L. ch. 279, § 30. And, a felon is disqualified from juror service until seven years from his conviction. Mass. Gen.L. ch. 234A, § 4. However, even after seven years, a judge can remove one from a jury panel solely on the basis of a prior felony conviction. Mass.Gen.L. ch. 234, § 8.

Clearly, the Massachusetts scheme neither provides for "individualized, affirmative actions" nor for complete "restoration," as the right to vote is never removed. *Ramos*, therefore, on both fronts, would mandate that Caron's Massachusetts convictions count for purposes of the ACCA. Now, sitting *en banc*, we revisit the question whether we should depart from the positions we took in *Ramos*.

## DISCUSSION

### A. *Restoration of Civil Rights: Individualized Acts Only?*

■ We approach the task of statutory interpretation with the following guideline foremost in mind:

*Dahms*, 938 F.2d 131 (9th Cir.1991); *United States v. Essick*, 935 F.2d 28 (4th Cir.1991); and *United States v. Cassidy*, 899 F.2d 543 (6th Cir. 1990).

So long as the statutory language is reasonably definite, that language must ordinarily be regarded as conclusive (at least in the absence of an unmistakable legislative intent to the contrary).

*United States v. Charles George Trucking Co.*, 823 F.2d 685, 688 (1st Cir.1987) (citations omitted).

The key words of 18 U.S.C. § 921(a)(20) are "expunged," "set aside," "pardoned," and "civil rights restored." All of the words signify a result: strike out, efface, eliminate (expunge); dismiss, discard, annul (set aside); excuse an offense without punishment, release an offender from punishment (pardon); bring back to an original state or condition (restore).[2] They do not address the means by which the results may be accomplished or, consequently, indicate preference for any particular means.

In *Ramos*, our panel assumed that pardons, expungements and restorations of rights all involved individualized official judgments and procedures. 961 F.2d at 1010. But the wide variety of practices adopted by states has since been pointed out. In *United States v. Glaser*, 14 F.3d 1213, 1218 (7th Cir.1994), the court noted that "[n]either pardons nor expungements are necessarily individualized," citing mass pardons by both Presidents Jefferson and Carter, and federal and state laws providing for "routine expungement" of convictions for juvenile offenses.

In *McGrath v. United States*, 60 F.3d 1005, 1008 (2d Cir.1995), the court recognized that "many states restore civil rights to convicted felons by means of a general law stating that all rights shall be reinstated upon the service of a sentence." It also noted that other states authorize officials to issue certificates of restoration after a given period of time

following sentence or parole, while a minority of states "restore rights in piecemeal fashion," and twelve states apparently have no provision regarding restoration of civil rights.

Perhaps even more significantly, in *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983), the Supreme Court recognized the diversity of state post-conviction actions such as expungement. It noted that over half the states had enacted such statutes and that they varied "in almost every particular," ranging from applicability only to young offenders or certain offenses to automatic expunction, and amounted to "nothing less than a national patchwork." *Id.* at 121–22, 103 S.Ct. at 996. The Court reasoned that the purpose of the federal firearms statute "would be frustrated by a ruling that gave effect to state expunctions," *id.* at 119, 103 S.Ct. at 995, and reversed a lower court ruling that had given full effect to a state expungement following a successfully served period of probation.[3]

Congressional reaction to *Dickerson* in large part accounted for the crafting of § 921(a)(20), which expressly allowed state law to define a predicate conviction for purposes of the federal firearms laws.[4] *See McGrath*, 60 F.3d at 1009. In interpreting § 921(a)(20), therefore, we take into account not only the diversity of state approaches to the restoration of civil rights of convicted felons but also the clearly manifested purpose of Congress to defer to state laws, in this context, in determining predicate convictions and the removal of firearm disqualifications. As the Court stated in *Dickerson*, "[a]s in all cases of statutory construction, our task is to interpret the words of [the statute] in light of the purposes Congress sought to serve." 460 U.S. at 118, 103 S.Ct.

---

**2.** These synonyms are substantially common to *The Random House Dictionary* (2d ed. 1987), *Webster's Third New International Dictionary* (1976), and *The American Heritage Dictionary* (1973).

**3.** The firearm disabilities were imposed by 18 U.S.C. §§ 922(g) and (h), enacted under Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 226 (1968) (as amended by the Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1214 (1968)).

In 1986, the Firearms Owners' Protection Act, Pub.L. No. 99–308, 100 Stat. 449 (1986), amended this law by, *inter alia*, changing § 921(a)(20) to its current form.

**4.** The sentence preceding the sentence at issue here provides that "[w]hat constitutes a conviction ... shall be determined in accordance with the law of the jurisdiction in which the proceedings were held." 18 U.S.C. § 921(a)(20).

at 995 (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979)).

In light of this background, we discern no basis for reading into the words at issue any gloss based on assumed frequency of use or primacy of meaning. And, we hesitate to impose a qualification upon these words absent some textual indication that such limitation is warranted.[5] Accordingly, we conclude that the plain language of § 921(a)(20) makes clear that the restoration of civil rights need not be focused or individualized.

From our present perspective, therefore, we see no need to look into legislative history.[6] *See Summit Inv. and Dev. Corp. v. Leroux,* 69 F.3d 608, 610 (1st Cir.1995) ("Plain statutory language does not prompt recourse to countervailing legislative history."). Nonetheless, given that we initially reached a contrary conclusion, and to ensure that there is not "a clearly expressed legislative intent to the contrary," *Dickerson,* 460 U.S. at 110, 103 S.Ct. at 990 (internal quotation marks and citation omitted), we take a brief foray into the legislative history of § 921(a)(20).

Our review leads us to the conclusion that the legislative history of the provision " 'is more conflicting than the [statutory] text is ambiguous.' " *United States v. Aversa,* 984 F.2d 493, 499 n. 8 (1st Cir.1993) (*en banc*) (quoting *Wong Yang Sung v. McGrath,* 339 U.S. 33, 49, 70 S.Ct. 445, 454, 94 L.Ed. 616 (1950)). We begin with the statutory predecessors of § 922(g)(1), 18 U.S.C.App. §§ 1201–1203, which proscribed, *inter alia,* the possession of firearms by a convicted felon, *id.* § 1202(a)(1), but exempted a person who had "expressly been authorized by the President or such chief executive [of a state] to . . . possess . . . a firearm." *Id.* § 1203(2). There was no comparable pardon provision applicable to the shipping or receipt of firearms under former §§ 922(g)(1) and (h)(1).

In 1981, S. 1030 was introduced, which, as revised, contained essentially the language of the last sentence of § 921(a)(20). *See Cassidy,* 899 F.2d at 547. A Senate Judiciary Committee Report explained that the bill would repair the above described inconsistency between §§ 922 and 1202 by expanding the pardon provision to encompass § 922. *See* S.Rep. No. 476, 97th Cong., 2d Sess. 18 (1982). In addition, the explicit reference to chief executives was dropped and the exemption was expanded to include expungements and restorations of civil rights. *See id.*

While such expansion might indicate a movement away from individualized action, other excerpts provide a contrary thrust. For instance, to demonstrate the need for the bill, the report expressly cited to *Thrall v. Wolfe,* 503 F.2d 313 (7th Cir.1974), where the court held that a state pardon still did

---

5. We do not overlook a plausible reading of the last clause of § 921(a)(20) ("unless such pardon . . . expressly provides that the person may not . . . possess . . . firearms"), which the panel in *Ramos* found supported its interpretation that individualized action was required. 961 F.2d at 1008. But we think an interpretation consistent with a broader reading is provided by *Glaser,* 14 F.3d at 1218:

> A person who contends that state statutes have restored all of his civil rights . . . [requires us] to examine the whole of state statutory law to determine whether the state treats him as "convicted" for the purpose of possessing firearms. When the state gives the person a formal notice of the restoration of civil rights, however, the final sentence of § 921(a)(20) instructs us to look, not at the content of the state's statute books but at the contents of the document.

This interpretation jibes with the Court's instruction in *Beecham v. United States,* —— U.S. ——, ——, 114 S.Ct. 1669, 1671, 128 L.Ed.2d 383 (1994), to focus on "the plain meaning of the whole statute—not of isolated sentences."

6. We note that the other circuits have, almost without exception, focused their analysis on the statutory language, rather than the legislative history. *See Hall,* 20 F.3d at 1069 (" '[R]estored' . . . does not suggest that the action must be individualized."); *Glaser,* 14 F.3d at 1218 ("Nothing in § 921(a)(20) distinguishes according to the frequency with which a state dispenses some boon."); *Thomas,* 991 F.2d at 213 ("[R]ights . . . reinstated automatically by operation of law . . . are no less 'restored' than are such rights that have been resurrected by an 'affirmative act' of the state."); *United States v. Gomez,* 911 F.2d 219, 221 (9th Cir.1990) ("If Congress intended to require an individual affirmative act of restoration by the state, Congress could have so provided."). *But see Cassidy,* 899 F.2d at 546 (relying on legislative history after concluding that it was not clear whether § 921(a)(20) contemplated looking only at a discrete document or the whole law of a state).

not permit one to receive or purchase a firearm. *See* S.Rep. No. 476, at 18. Although the report made no mention of the kind of pardon in *Thrall*, it was an individualized one. The report also used the following language to describe the last clause of § 921(a)(20): "In the event that *the official* granting the pardon, restoration of rights or expungement of record does not desire it to restore the right to firearm ownership, this provision is rendered inapplicable where the order or pardon expressly provides that the person may not possess firearms." *Id.* (emphasis added). And it referred to this last clause as providing "flexibility should such a pardon or restoration be based upon considerations not relating to fitness to own a firearm." *Id.* at 12. Taken together, these extracts might indicate that individualized actions were intended.

Nonetheless, we note that S. 49, the successor to S. 1030, was explained by Senator Hatch as addressing the problem created by imposing federal sanctions on persons who "have had their full civil rights restored pursuant to State law." He added:

> This [bill] will accommodate State reforms enacted since 1968 which permit dismissal of charges after a plea and successful completion of a probationary period. Since the Federal prohibition is triggered by the States' conviction, the States' law as to what disqualifies an individual from firearms use should govern.

131 Cong.Rec. S8,689 (daily ed. June 24, 1985). Both the reference to reforms and the linking of state power to define both the triggering conviction and the conditions of disqualification tilt toward the inclusion of generic restorations of rights.

It could be and has been argued that Congress, which has held itself out as endeavoring to tighten laws against firearms abusers, would not lightly turn over final decision power to the states, allowing them in effect to nullify federal sanctions. But, as the Second Circuit observed,

> The very decision to have restoration triggered by events governed by state law insured anomalous results.... They are the inevitable consequence of making ac-

cess to the exemption depend on the differing laws and policies of the several states. *McGrath*, 60 F.3d at 1009.

In summary, we discern no such clear and compelling evidence of Congressional intent to limit restoration of civil rights to individualized procedures and judgments as to change our interpretation of what we deem to be unambiguous language. *Ramos'* holding regarding the need for individualized action is overruled.

B. *Restoration of Rights Not Taken Away*

It remains for us to decide whether civil rights never taken away can be said to be "restored." The *Ramos* panel, dealing with a person convicted of a misdemeanor, and therefore a person whose civil rights were left untouched by Massachusetts law, concluded that "restore" meant the giving back of what had been taken away. It addressed the anomaly that those convicted of mere misdemeanors could never have firearms while those convicted of the most serious crimes could qualify, and responded that "[b]y the affirmative act of pardon, expungement or restoration, the state has declared its renewed trust in that person." 961 F.2d at 1009.

In *McGrath*, the Second Circuit agreed, rejecting the argument that not having suffered the loss of one's civil rights is the "functional equivalent" of restoration, explaining, "[t]he 'restoration' of a thing never lost or diminished is a definitional impossibility." 60 F.3d at 1007. It discerned an intent in the 1986 legislation to treat "a subsequent forgiveness ... as an acknowledgement of rehabilitation or an affirmative gesture of goodwill that merited exemption from the firearms bar." *Id.* And, as far as the probability of "anomalies" was concerned, the court, as we have noted, deemed this as inevitable. It concluded that only Congress or the particular state can properly address the problem.

This reasoning, admittedly technical, is not easily dismissed. The use of the word "restore" calls for some affirmative act by the state. It is not cavalierly ignored. In the instant case, however, we are not confronted with a total absence of affirmative action, as

in *Ramos* and *McGrath*. Here, affirmative action has taken place with respect to the right to sit on a jury (subject to some contingency) and the right to hold public office. Only the right to vote was not taken away. The words of § 921(a)(20) literally apply: Caron is "a person [who] ... has had civil rights restored." In this case, therefore, the dictates of both literalism and sense are met.

We leave till another day the question whether, when *one* civil right is restored but two were never taken away, the same answer would prevail, together with the basic question whether the literal application of "restore" to a case where no civil rights were taken away is so lacking in sense as to command the same result. We acknowledge, however, that, contrary to *Ramos*' holding, the "restoration" requirement does not automatically exclude the possibility that rights never taken away can sometimes be viewed as rights restored. In addition, we note that § 921(a)(20) would seem to be in need of revisiting by the Congress so that the problems that have busied the courts might be resolved in harmony with legislative intent.

\* \* \* \* \* \*

Our two holdings do not dispose of this case. There remain other asserted issues, including whether the right to sit on a jury has been sufficiently restored, and whether there has been an express provision that appellant may not possess firearms. We must leave to the district court the determination whether these and other issues have been raised and preserved, and their disposition on the merits.

*The judgment is vacated and the matter remanded to the district court for resentencing. As to all other issues in the case, the original panel opinion shall remain in full force.*