9th Circuit Court — Nashua District Division
Hillsborough-southern judicial district
Nos. 2013-513
 2014-017

GREG DUPONT

v.

NASHUA POLICE DEPARTMENT

GREGORY DUPONT

v.

PETER MCDONOUGH & a.

Argued: June 26, 2014
Opinion Issued: February 20, 2015

*Penny S. Dean*, of Concord, by brief and orally, and *Jay Edward Simkin*, non-attorney representative, by brief and orally, for the petitioner.

*Stephen M. Bennett*, corporation counsel, of Nashua, on the brief and orally, for respondent City of Nashua.

*Joseph A. Foster*, attorney general (*Rebecca L. Woodard*, assistant attorney general, on the memorandum of law and orally), for respondents Peter McDonough, Christopher B. Casko, John J. Barthelmes, and Sean Haggerty.

HICKS, J. In these consolidated cases, the petitioner, Gregory DuPont, appeals: (1) an order of the Circuit Court (*Leary*, J.) affirming the revocation by the respondent City of Nashua (City), through its chief of police, of his license to carry a loaded pistol or revolver; and (2) an order of the Superior Court (*Nicolosi*, J.) denying his motion for preliminary injunctive relief in a proceeding brought against the respondents Peter McDonough, Sean Haggerty, Christopher B. Casko, and John J. Barthelmes, challenging the denial of his request for an armed security guard license. We reverse and remand.

The following facts are taken from the trial courts' orders or are supported in the record. In 1998, the petitioner was convicted in Massachusetts of operating a motor vehicle under the influence of liquor (the 1998 conviction). That offense was a misdemeanor that carried a potential maximum prison sentence of two and a half years. Thus, the petitioner's 1998 conviction rendered him ineligible, under Massachusetts law, to possess or carry a firearm, at least as of the 1998 amendments to the Massachusetts firearms laws. *See Dupont v. Chief of Police of Pepperell*, 786 N.E.2d 396, 398-400 (Mass. App. Ct. 2003) (applying 1998 amendments where conviction predated them), Mass. Gen. Laws Ann. ch. 140 §§ 129B (West Supp. 1997) (amended 1998, 2000, 2002, 2003, 2004, 2010, 2011, 2014), 129C (West Supp. 1997) (amended 1998, 1999, 2010, 2014), 131 (West Supp. 1997) (amended 1998, 2002, 2003, 2004, 2008, 2010, 2011, 2014), Mass. Gen. Laws Ann. ch. 269 § 10(a) (West Supp. 1997) (amended 2006, 2014), (h) (West Supp. 1997) (amended 1998, 2006). In 2005, upon the petitioner's petition for review, the Massachusetts Firearm Licensing Review Board (FLRB) found that the petitioner was "a suitable person to possess a license to carry firearms, and his right to possess a firearm therefore is fully restored in the Commonwealth." The FLRB accordingly determined that, notwithstanding the 1998 conviction, the petitioner could apply to his licensing authority for a license to carry firearms.

In 2007, the City's chief of police issued the petitioner a license to carry a pistol or revolver, and that license was renewed in 2012. In 2009, the New Hampshire Department of Safety (DOS) issued the petitioner an armed security guard license.

Sometime prior to June 29, 2010, Sergeant Lobrano of DOS became aware of the 1998 conviction and determined that it disqualified the petitioner, under federal law, from possessing firearms. Accordingly, on June 29, 2010, Lobrano notified the petitioner that he was revoking the petitioner's armed security guard license. On the same day, Lobrano issued the petitioner an unarmed security guard license.

The petitioner appealed Lobrano's decision to a hearings examiner, who upheld it. The petitioner then appealed the hearings examiner's decision to the superior court. On March 9, 2011, while the parties were awaiting decision on their cross-motions for summary judgment, DOS's attorney, respondent Casko, offered the petitioner the following settlement:

1. You will agree to the dismissal of your appeal of the hearings examiner's decision pending in the Hillsborough South Superior Court. To achieve such, I will file an Assented to Motion for Voluntary Nonsuit with Prejudice of the case.

2. In exchange, the Department of Safety will reissue your armed security guard license upon your signing and returning the agreement to me.

3. You agree to waive any claim for damages due to lost wages against the Department of Safety related to this matter.

4. The Department agrees not to use the conviction for Operating Under the Influence from Lowell District Court Docket #9811CR1032A as a basis to revoke or deny such license in the future.

5. If you agree, please verify same by signing below.

The petitioner agreed to the terms of the offer (the 2011 settlement) and the case was non-suited.

In February or March 2013, the petitioner applied to the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for a Curios and Relics License. By apparent agreement with the ATF, local police departments conduct background checks on federal license applicants. Accordingly, the Nashua Police Department conducted a background check on the petitioner in 2013 and, in doing so, learned of the 1998 conviction. Why the City had not discovered the 1998 conviction previously, despite having conducted at least two prior background checks on the petitioner, is not explained in the record.

Nashua Police Lieutenant Michael Moushegian, who reviewed the petitioner's federal application, determined that the 1998 conviction disqualified the petitioner from both the federal license for which he had applied and his state license to carry. Moushegian advised the police chief that he should not only recommend that the ATF deny the petitioner his federal Curio and Relics license, but that he should also revoke his state license to carry. On March 28, 2013, Nashua Police Chief John Seusing revoked the petitioner's license to carry. The petitioner appealed the revocation to the circuit court, and, following that court's affirmance of Chief Seusing's decision, he appealed to this court.

In June 2013, the petitioner applied to renew his armed security guard license. New Hampshire State Police Sergeant Sean Haggerty notified the petitioner on July 8, 2013, that his application had been conditionally denied. The superior court found it implicit in Haggerty's decision that denial was based upon the 1998 conviction. The petitioner filed a motion in superior court to bring forward and enforce the 2011 settlement agreement. Following denial of his motion for preliminary injunctive relief, the petitioner appealed to this court.

On appeal, the petitioner argues that the trial courts erred in: (1) upholding Chief Seusing's revocation of his license to carry; (2) upholding the DOS's decision to rescind the 2011 settlement; (3) failing to find that the City was bound by the 2011 settlement; (4) misinterpreting 18 U.S.C. §§ 921(a)(20) *et seq.*; (5) disregarding the findings and conclusions of the FLRB's decision restoring his right to possess firearms; and (6) failing to "give full faith and credit to the provisions of the public acts, records and judicial proceedings in Massachusetts."

We first consider the applicable standards for reviewing each of the trial court orders the petitioner appeals. RSA 159:6-b, I, provides, in pertinent part, that "[t]he issuing authority may order a license to carry a loaded pistol or revolver issued to any person pursuant to RSA 159:6 to be . . . revoked for just cause." RSA 159:6-b, I (2014). We held in *Bleiler v. Chief, Dover Police Dep't*, 155 N.H. 693 (2007), that " 'just cause' refers to a licensee's use of a weapon for an improper purpose or to the licensee's status as an unsuitable person." *Bleiler*, 155 N.H. at 702. That decision may be appealed to the circuit court pursuant to RSA 159:6-c. *See* RSA 159:6-c (2014); RSA 490-F:3 (Supp. 2014) (providing, in part, that "[t]he circuit court shall have the jurisdiction, powers, and duties conferred upon the former . . . district courts").

We have held, with respect to such an appeal, "that the statute contemplates that the [trial] court will hear evidence and make its own determination whether the petitioner is entitled to a license." *Silverstein v.*

*Town of Alexandria,* 150 N.H. 679, 681 (2004) (quotation and brackets omitted). In our review of the trial court's decision, we defer to the court's factual findings, provided there is evidence in the record to support them. *Cf. Jacobs v. Director, N.H. Div. of Motor Vehicles,* 149 N.H. 502, 503 (2003) (review of superior court decision on appeal from an administrative license suspension by the department of motor vehicles). We review the trial court's application of the law to the facts de *novo. Cf. id.* at 504.

■ "A preliminary injunction is a provisional remedy that preserves the status quo pending a final determination of the case on the merits." *N.H. Dep't of Envtl. Servs. v. Mottolo,* 155 N.H. 57, 63 (2007). "[A] party seeking an injunction must show," among other things, "that it would likely succeed on the merits." *Id.* "[T]he granting of an injunction is a matter within the sound discretion of the Court exercised upon a consideration of all the circumstances of each case and controlled by established principles of equity." *UniFirst Corp. v. City of Nashua,* 130 N.H. 11, 14 (1987) (quotation and ellipsis omitted). "We will uphold the decision of the trial court with regard to the issuance of an injunction absent an error of law, [unsustainable exercise] of discretion, or clearly erroneous findings of fact." *Id.; State v. Lambert,* 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

Both of the trial courts' decisions involved, in part, an interpretation of federal law governing firearms possession. In affirming Chief Seusing's revocation of the petitioner's license to carry, the trial court reasoned that the petitioner could not "be deemed suitable to possess a license to carry a pistol or revolver" because, "[u]nder applicable federal law, which New Hampshire must follow under the Supremacy Clause of the U.S. Constitution, [the petitioner] cannot possess a firearm." Similarly, with respect to the petitioner's motion for preliminary injunctive relief in the proceeding to enforce the settlement agreement, the trial court concluded that the petitioner had failed to show a likelihood of success on the merits because it appeared that the settlement agreement was unenforceable as violative of federal law. Accordingly, we address the petitioner's first, second, and fourth arguments together, and we begin by examining the relevant federal statutes and their application to the petitioner.

Under federal law, it is unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to possess any firearm. 18 U.S.C. § 922(g)(1) (2012). Without more, it would appear that the petitioner falls under this prohibition. 18 U.S.C. § 921(a)(20), however, provides, in pertinent part:

> The term "crime punishable by imprisonment for a term exceed-
> ing one year" does not include —

. . .

> (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

> What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned *or has had civil rights restored* shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C. § 921(a)(20) (2012) (emphasis added).

Although classified as a misdemeanor, the petitioner's 1998 conviction carried a potential maximum prison sentence of two and a half years. Thus, that offense does not fall within the exclusion of § 921(a)(20)(B). Nevertheless, the petitioner contends that the 1998 conviction is one that "has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored." 18 U.S.C. § 921(a)(20). This contention forms the crux of his appeal.

██ Because the meaning of § 921(a)(20) is a question of federal law, we interpret it in accordance with federal policy and precedent. *Dube v. N.H. Dep't of Health & Human Servs.*, 166 N.H. 358, 364 (2014). "When interpreting a statute, we begin with the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning." *Id.* "We do not read words or phrases in isolation, but in the context of the entire statutory scheme." *Pelkey v. Dan's City Used Cars*, 163 N.H. 483, 487 (2012), *aff'd*, 133 S. Ct. 1769 (2013).

██ The Second Circuit Court of Appeals has concisely stated Congress's purpose in enacting § 921(a)(20). "The exemption at issue was passed in 1986 in response to a 1983 Supreme Court decision which held that the definition of a predicate offense under the Gun Control Act of 1968 was a matter of federal, not state law." *McGrath v. United States*, 60 F.3d 1005, 1009 (2d Cir. 1995); *see Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 111-12 (1983), *superseded by statute*, Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986). "Section 921(a)(20) was expressly crafted to overrule *Dickerson*'s federalization of a felon's status by allowing state law to define which crimes constitute a predicate offense under the statute, and thereby to determine which convicted persons should be subject to or exempt from federal prosecution for firearms possession."

*McGrath*, 60 F.3d at 1009. "Calling its new legislation the 'Firearms Owners' Protection Act [FOPA],' Congress sought to accommodate a state's judgment that a particular person or class of persons is, despite a prior conviction, sufficiently trustworthy to possess firearms." *Id.* Thus, the determination of "whether a person has had civil rights restored [for purposes of § 921(a)(20)] . . . is governed by the law of the convicting jurisdiction." *Beecham v. United States*, 511 U.S. 368, 371 (1994).

The circuit court found that the petitioner's 1998 conviction "has not been expunged or set aside nor has he been pardoned." The petitioner does not challenge these findings. The circuit court also found, relying upon *Logan v. United States*, 552 U.S. 23 (2007), that the petitioner "has not lost any civil right as a result of his conviction[,] for the right to carry a gun is a constitutional, not civil, right." The superior court found it to be "generally accepted" that the civil rights to which § 921(a)(20) refers are the rights to vote, hold public office, and serve on a jury. It concluded, also relying upon *Logan*, that because "the petitioner never lost any of these rights, . . . [he] never had the opportunity to have them 'restored.'" The court therefore found that "the petitioner is not entitled to the exception under 18 U.S.C. § 921(a)(20)(B)."

The petitioner challenges both rulings, arguing that "[t]he right to keep and bear arms is a subset [of] and necessarily included [with]in [the term] civil rights" and that he "had that civil right . . . taken away from him upon his 1998 conviction and *restored to him*." According to the petitioner, "[t]he question devolves to whether the FLRB's restoration under Massachusetts law of [the petitioner's] constitutional right to possess a firearm is considered a restoration of civil rights within the meaning of 18 U.S.C. § 921(a)(20)(B)." That question contains three subsidiary inquiries: (1) are the civil rights contemplated by § 921(a)(20) limited to the rights to vote, hold public office, and serve on a jury; (2) if not, is the right to keep and bear arms included in the term "civil rights" as used in that section; and (3) if so, is restoration of that right alone sufficient to come within that statute's exemption. We address each inquiry in turn.

The City contends that the Supreme Court in *Logan* "determined that the term 'civil rights', in the context of 18 U.S.C. § 921(a)(20), referred to 'the rights to vote, hold office and serve on a jury.'" (Quoting *Logan*, 552 U.S. at 28). The petitioner, on the other hand, contends that *Logan*'s "passing reference [to the rights of voting, office holding, and jury service] is mere dicta." We agree with the petitioner. The *Logan* Court noted that "[w]hile § 921(a)(20) does not define the term 'civil rights,' courts have held, *and petitioner agrees*, that the civil rights relevant under the above-quoted provision are the rights to vote, hold office, and serve on a jury." *Logan*, 552 U.S. at 28 (emphasis added). Because the petitioner in *Logan* conceded this

issue, the Court was not called upon to, and did not, resolve what rights are "civil rights" for purposes of § 921(a)(20).

The petitioner notes that the seminal case on this issue is *United States v. Cassidy*, 899 F.2d 543 (6th Cir. 1990), which held that the rights encompassed in the term "civil rights," as used in § 921(a)(20), *"include* the right to vote, the right to seek and hold public office and the right to serve on a jury." *Cassidy*, 899 F.2d at 549 (emphasis added). Emphasizing the word "include," the petitioner argues that *"Cassidy* and its progeny, correctly read, do not mandate slavish devotion to the three identified rights."

Some federal circuits, including the First Circuit, appear to have limited § 921(a)(20) to the so-called "core" civil rights of voting, office holding, and jury service. *See, e.g., United States v. Caron*, 77 F.3d 1, 2 (1st Cir. 1996) (citing *Cassidy*, but changing the word "include" to "comprise"). The question is not settled, however, and the First Circuit itself has noted that other circuits "treat[ ] firearms privileges as one of the civil rights that must be restored to trigger section 921(a)(20)." *United States v. Estrella*, 104 F.3d 3, 8 (1st Cir. 1997) (identifying the Seventh and Eighth Circuits).

We find instructive the First Circuit's observation that "[a]lthough Congress did not specify which civil rights it had in mind, the plurality view among the circuits," including the First Circuit, "is that Congress had in mind the core cluster of 'citizen' rights *that are typically lost by felons and restored by pardons*, namely, the right to vote, to serve on a jury and to hold public office." *United States v. Indelicato*, 97 F.3d 627, 630 (1st Cir. 1996) (emphasis added), *abrogated on other grounds by Logan v. United States*, 552 U.S. 23 (2007). We agree with the reasoning that Congress logically intended that the rights required to be restored are those rights typically lost upon a conviction. One of the rights typically lost by felons, however, is the right to possess a firearm. *See, e.g.,* RSA 159:3 (2014) (criminalizing the possession of firearms by convicted felons). Limiting the applicable rights to the so-called "core" civil rights, to the exclusion of other rights typically stripped from convicted felons, appears to be inconsistent with that reasoning.

The petitioner does not argue that firearm possession is a civil right under Massachusetts law, and, in any event, relevant case law appears to preclude that argument. *See United States v. Nazzaro*, 778 F. Supp. 1, 2 (D. Mass. 1991) (concluding that "possession of a firearm is not a civil right . . . [under] Massachusetts law"), *aff'd*, 985 F.2d 552 (1st Cir. 1993); *Chief of Police of Shelburne v. Moyer*, 453 N.E.2d 461, 464 (Mass. App. Ct. 1983) (recognizing that "[t]here is no right under art. 17 of the Declaration of Rights of the Massachusetts Constitution for a private citizen to keep and bear arms"); *Commonwealth v. Davis*, 343 N.E.2d 847, 848-49 (Mass. 1976)

(concluding that "the declared right [in Article 17] to keep and bear arms is that of the people, the aggregate of citizens; the right is related to the common defense" and holding that "[p]rovisions like art. 17 were not directed to guaranteeing individual ownership or possession of weapons"). Rather, the petitioner looks to the right to keep and bear arms guaranteed by the Second Amendment to the United States Constitution, and, in particular, relies upon two United States Supreme Court cases dealing with that guarantee.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the District of Columbia's "ban on handgun possession in the home . . . [and] its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense" violated the Second Amendment. *Heller*, 554 U.S. at 635. In so holding, the Court found that the Second Amendment "conferred an individual right to keep and bear arms." *Id.* at 595. In *McDonald v. Chicago*, 561 U.S. 742 (2010), the Court held that "the Second Amendment right is fully applicable to the States." *McDonald*, 561 U.S. at 750.

The Sixth Circuit has opined that *Heller* "suggests that a handgun possession ban . . . might infringe a civil right." *United States v. Sanford*, 707 F.3d 594, 597 (6th Cir. 2012); *cf. Cassidy*, 899 F.2d at 549 n.12 (rejecting the argument that "a convicted felon cannot have a restoration of rights without a restoration of his state firearms 'rights' " on the basis "that there is no individual right to possess a firearm," a basis that no longer stands in light of *Heller* and *McDonald*). In addition, the Supreme Court has referred, in an unrelated context, to the loss of the right to bear arms as the deprivation of a civil right. *See Nat. Fedn. of Indep. Business v. Sebelius*, 132 S. Ct. 2566, 2600 (2012) (noting that "[a]n individual who disobeys" a law passed under Congress's Commerce Clause power "may be subjected to criminal sanctions . . . [which] can include not only fines and imprisonment, but all the attendant consequences of being branded a criminal: deprivation of otherwise protected civil rights, such as the right to bear arms or vote in elections").

More relevant to interpreting the statute before us is what the First Circuit has recognized as "the rationale behind Congress' use of 'civil rights restored' as a touchstone: the notion that by reinvesting a person with core civic responsibilities, the state vouches for the trustworthiness of that person to possess firearms (unless that right is withheld)." *Estrella*, 104 F.3d at 7. Thus, as the petitioner puts it: "The right[s] to vote, hold office and sit on a jury are simply surrogates for an underlying state determination/vouching for a person's trustworthiness to possess a firearm." We find it unlikely that Congress intended to credit the restoration of "core rights" as indicative of trustworthiness, but exclude the restoration of the

very right at issue — the right to possess firearms — from the trustworthiness calculus. *Cf. Coram v. State*, 996 N.E.2d 1057, 1077 (Ill. 2013) (Karmeier, J., writing separately) (opining that "whether a person previously convicted of an offense constitutes a present danger with a weapon going forward, and whether that individual's rights to keep and bear arms should be restored . . . , logically, should be the core question" instead of "quibbling over what rights irrelevant to that question have been restored, or, as some cases would have it, *how many* of those rights").

Another perspective is suggested by the Sixth Circuit's observation that § 921(a)(20) reflects "the general intent of Congress to redirect enforcement efforts against firearms owners that have a demonstrated potential for serious unlawful activity." *Cassidy*, 899 F.2d at 549. In this light, the Ninth Circuit has recognized that "[b]y contrast to the right to vote, no civil right could be more relevant to a felon's future dangerousness than the right to possess firearms." *United States v. Valerio*, 441 F.3d 837, 842 (9th Cir. 2006).

■ We conclude that the "civil rights" contemplated by § 921(a)(20) are not limited to the three "core" civil rights and that the Second Amendment right to keep and bear arms is a civil right within the statute's ambit. We must now determine whether restoration of that right alone brings a conviction within the § 921(a)(20) exemption.

Courts generally have not been receptive to the argument that restoration or retention of firearm rights is, without more, sufficient to trigger § 921(a)(20)'s exemption. In *Valerio*, for instance, despite having noted the relevance of the right, the court found that New Mexico's restoration of the defendant's "right to possess firearms . . . [was] not enough" to fall under § 921(a)(20)'s exemption. *Id.* at 842-43. Similarly, the Fifth Circuit, in rejecting the contention that "Texas's failure to deny [a non-violent felon] the right to possess firearms is the functional equivalent of restoring his civil rights," stated that " 'civil rights,' as used in § 921(a)(20), must mean much more than simply the single, narrow right to possess a firearm." *United States v. Thomas*, 991 F.2d 206, 214-15 (5th Cir. 1993). Other circuits have reached similar conclusions. *See, e.g., United States v. Molina*, 484 Fed. Appx. 276, 284 (10th Cir. 2012) (following *Valerio*, and noting, in response to a void for vagueness argument, that "the fact 'civil rights' is plural would alone put a reasonable person on fair notice that more than just his right to possess a firearm must be restored under [18 U.S.C.] § 921(a)(20)").

These cases generally follow the reasoning that "[i]n the absence of the restoration of essentially all civil rights of the convicted felon as defined for purposes of § 921(a)(20), the felon's isolated right to possess a firearm is of

no import whatsoever." *Thomas*, 991 F.2d at 214. In each of these cases, the defendant's "core" civil rights had been lost and not substantially restored. *See id.* (finding that "Texas does *not* restore to any felon, whether violent or non-violent, the three [core] civil rights"); *Valerio*, 441 F.3d at 842 (observing that only the defendant's right to vote had been restored); *Molina*, 484 Fed. Appx. at 281 (noting that the defendant's rights to vote and serve on a jury had been restored, while his right to hold public office had not).

In the instant case, however, the petitioner never lost his core civil rights. Thus, the foregoing cases are, on that point, distinguishable. The question we must consider, then, is whether restoration of the right to possess firearms, along with retention of the three core civil rights, is enough to trigger the § 921(a)(20) exemption. Because the Supreme Court has addressed the retention and restoration of civil rights in the context of § 921(a)(20), we first look to the Court's holding on that issue.

In *Logan*, the Supreme Court considered the § 921(a)(20) exemption in the context of determining whether a conviction could be counted for purposes of sentence enhancement under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1) (2012). The case presented the following question: "Does the 'civil rights restored' exemption contained in § 921(a)(20) encompass, and therefore remove from ACCA's reach, state-court convictions that at no time deprived the offender of civil rights?" *Logan*, 552 U.S. at 26. The petitioner had argued in the District Court and on appeal that "[r]ights retained . . . are functionally equivalent to rights revoked but later restored." *Id.* at 29. The Supreme Court, however, ruled to the contrary. *Id.* at 36.

Relying upon *Logan*, the superior court here ruled that because "the petitioner never lost any of [the core civil] rights, . . . [he] never had the opportunity to have them 'restored' " and, therefore, was "not entitled to the exception under 18 U.S.C. § 921(a)(20)(B)." We do not agree that *Logan* compels that result. If *Logan* had definitively limited the "civil rights" relevant to § 921(a)(20) to the three core civil rights, it would bar the petitioner from that section's exemption because he, like the petitioner in *Logan*, at all times retained those rights. *See id.* at 29. However, as we previously noted, *Logan* did not decide the issue because the petitioner had agreed that the relevant rights were the rights to vote, hold office, and serve on a jury. *Id.* at 28.

█ *Logan* held that "the words 'civil rights restored' do not cover the case of an offender who lost *no* civil rights." *Id.* at 36 (emphasis added). The Court held that "an offender who retained civil rights at all times, and whose legal status, post[-]conviction, remained in all respects unaltered by

any state dispensation" did not come within the exemption of § 921(a)(20). *Id.* at 26. The Court reasoned that "a defendant who retains rights is simply left alone. He receives no status-altering dispensation, no token of forgiveness from the government." *Id.* at 32.

 The petitioner here, however, did receive a "status-altering dispensation," *id.*, from Massachusetts through the FLRB's determination. As previously noted, the FLRB specifically found that the petitioner was "a suitable person to possess a license to carry firearms, and his right to possess a firearm therefore is fully restored in the Commonwealth." Given our conclusion that the right to keep and bear arms is a civil right for purposes of § 921(a)(20), the petitioner has had one civil right "restored" in the *Logan* sense. Accordingly, we conclude that *Logan* does not exclude the petitioner from § 921(a)(20)'s exemption.

We turn now to the ultimate question before us: whether the loss and restoration of one civil right — the right to keep and bear arms — in fact brings the petitioner's 1998 conviction within § 921(a)(20)'s exemption. *Cassidy* set forth an oft-cited standard, stating that "based on the general intent of Congress to redirect enforcement efforts against firearms owners that have a demonstrated potential for serious unlawful activity, [we are confident] that Congress envisioned a restoration of more than a *de minimis* quantity of civil rights." *Cassidy*, 899 F.2d at 549. The court "d[id] not read into the statutory language, however, a requirement that there be a 'full' restoration of rights." *Id.*

In *Caron*, the First Circuit addressed a case in which a defendant had two of the three core civil rights restored by operation of law at some point post-conviction, while the third had never been taken away. *Caron*, 77 F.3d at 1. The court held that "at least where some civil rights are restored . . . , the fact that one civil right was never lost does not prevent an individual from having 'had civil rights restored' within the meaning of" § 921(a)(20). *Id.* at 2; *see also Buchmeier v. United States*, 581 F.3d 561, 564-65 (7th Cir. 2009) (concluding, post-*Logan*, that where defendant had rights to vote and hold office restored, while right to serve on a jury was never suspended, his civil rights had been restored under § 921(a)(20)). The court "[left until] another day the question whether, when *one* civil right is restored but two were never taken away, the same answer would prevail." *Caron*, 77 F.3d at 6. The Sixth Circuit appears to have held, with respect to an exemption provision worded similarly to 18 U.S.C. § 921(a)(20) and applicable to domestic violence misdemeanants, that loss and restoration of a single civil right — there, the right to vote — was sufficient. *United States v. Wegrzyn*, 305 F.3d 593, 596 (6th Cir. 2002) (applying 18 U.S.C. § 921(a)(33)(B)(ii)).

The question before us is even further attenuated: where none of the three "core" civil rights were taken away, but the civil right to keep and bear arms was lost and expressly restored, has the petitioner had his civil rights restored for purposes of § 921(a)(20)? We hold that he has.

■ Looking to Congress's intent, we note that:

> The FOPA amendment . . . exempted felons to whom the convicting jurisdiction extended a subsequent gesture of forgiveness, or partial forgiveness, by means of pardon, expungement, or restoration of civil rights. The theory was no doubt that such a subsequent forgiveness should be credited as an acknowledgment of rehabilitation or an affirmative gesture of goodwill that merited exemption from the firearms bar.

*McGrath*, 60 F.3d at 1007. We also again note that the ultimate question is whether the state, by its "gesture of forgiveness," has "vouche[d] for the trustworthiness of that person to possess firearms (unless that right is withheld)." *Estrella*, 104 F.3d at 7. The gesture of forgiveness here — explicit restoration of firearm rights — vouches for that trustworthiness more directly than any other.

We acknowledge that courts applying the § 921(a)(33)(B)(ii) exception for domestic violence misdemeanants, *see* 18 U.S.C. § 921(a)(33)(B)(ii) (2012), have declined to find restoration of gun rights, along with retention of the core civil rights, sufficient to bring a prior conviction within the exemption. *See, e.g., United States v. Brailey*, 408 F.3d 609, 613 (9th Cir. 2005); *United States v. Keeney*, 241 F.3d 1040, 1044 (8th Cir. 2001). In particular, the court in *Enos v. Holder*, 855 F. Supp. 2d 1088 (E.D. Cal. 2012), *aff'd*, 585 Fed. Appx. 447 (9th Cir. 2014), addressed the very argument presented here. Specifically, the plaintiffs in *Enos* "contend[ed] that following the Supreme Court's decisions" in *Heller* and *McDonald*, "which recognized the right to bear arms as a fundamental individual right, the Court should re-interpret the 'restoration of rights' provision as including cases such as Plaintiff[s'], where the only right that was taken away and then restored was the right to possess a firearm." *Enos*, 855 F. Supp. 2d at 1095. The court declined to interpret § 921(a)(33)(B)(ii) to "put restoration of an individual['s] right to possess a firearm within the purview of 'civil rights restored,' which courts have repeatedly classified as the right to vote, hold public office and sit on a jury." *Id.* at 1096.

■ We decline to follow those cases. We conclude that our interpretation of § 921(a) better fulfills Congress's purpose of "defer[ring] to a State's dispensation relieving an offender from disabling effects of a conviction." *Logan*, 552 U.S. at 37. Here, Massachusetts acted clearly and directly to

remove the restriction the petitioner's 1998 conviction had placed upon his civil right to keep and bear arms. We hold that Massachusetts thereby restored the petitioner's civil rights within the meaning of § 921(a)(20). Accordingly, § 922(g)(1) does not prohibit the petitioner from possessing firearms. We reverse both trial courts' decisions resting upon the contrary conclusion and remand for further proceedings. In light of our holding on this issue, we need not address the petitioner's additional arguments.

*Reversed and remanded.*

DALIANIS, C.J., and CONBOY, LYNN, and BASSETT, JJ., concurred.